**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
───────────────────────────────────────────────

**THOMAS G. HOULAHAN,**

                              **Plaintiff,**

                 v.                                    1:04-CV-1161
                                                               (FJS)

**FREEMAN WALL AIELLO, a Partnership,**
**and JAMES WALL, an Individual,**

                              **Defendants.**

───────────────────────────────────────────────

**APPEARANCES**                                             **OF COUNSEL**

**THOMAS G. HOULAHAN**
Washington, D.C. 20016
Plaintiff *pro se*

**MACLEAY, LYNCH &**                               **JACK D. LAPIDUS, ESQ.**
**LAPIDUS, P.C.**
1629 K Street, NW
Suite 802
Washington, D.C. 20006
Attorneys for Defendants

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Currently before the Court is Defendants James Wall and Freeman Wall Aiello's motion for summary judgment. *See* Dkt. No. 160. Plaintiff opposes this motion. *See* Dkt. No. 160.

### II. BACKGROUND

Plaintiff filed this action against, among others, Defendants James Wall and his public

relations firm, Freeman Wall Aiello (hereinafter referred to collectively as "Defendant Wall").[1]
In his amended complaint, Plaintiff alleged claims of intentional interference with prospective economic advantage, defamation, and abuse of process.[2] Plaintiff also sought punitive damages. Only Plaintiff's claim for defamation remains for the Court's consideration.

Plaintiff is an investigative journalist, who in 2003 began investigating the teen behavior modification industry. Former Defendant World Wide Association of Specialty Programs and Schools ("WWASPS") is an association of teen behavior modification facilities. WWASPS hired Defendant Wall in 2003 to conduct public relations for the association. During the course of his investigation, Plaintiff communicated with Defendant Wall and Ken Kay, then President of WWASPS. In February 2004, WWASPS filed a lawsuit against Plaintiff. Shortly thereafter, Defendant Wall issued a press release on behalf of WWASPS regarding the lawsuit and quoting Mr. Kay. Plaintiff's defamation claim against Defendant Wall arises out of certain e-mail communications that preceded the February 2004 lawsuit and certain statements in the press release.

### III. DISCUSSION

**A.     Summary judgment standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

---

[1] Plaintiff has settled his claims with the other Defendants.

[2] The parties agree that, based on the Court's earlier decisions in this case, the Court should grant Defendant Wall's motion for summary judgment with respect to Plaintiff's claim for intentional interference with prospective economic advantage. Furthermore, Plaintiff did not assert his claim for abuse of process against Defendant Wall.

if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the movant meets his burden, the party opposing the motion "'may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided for in [Rule 56] – set out specific facts showing a genuine issue for trial.'" *Tate v. Dist. of Columbia*, 627 F.3d 904, 908-09 (D.C. Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2) (2008)).

**B.    Plaintiff's defamation claim**

At issue in this case are six statements. Plaintiff claims that four of these statements were included in e-mails and were defamatory. *See* Amended Complaint at ¶¶ 40-43. Plaintiff alleges that Defendant Wall directed one of these statements to Mr. Tobin Beck, Plaintiff's editor at UPI, and initially directed the other three statements to Plaintiff and then sent them to Mr. Beck.

The three statements that Defendant Wall directed to Plaintiff are as follows:

> 1. "The fact that you are now purveying your perverse views (torture, abuse, battery, etc.) in personal telephone conversations to parents of children who have contractual relationships with Ivy Ridge/TB could well be an issue for their attorneys to take up."[3]
>
> 2. "I view this conduct as wholly unethical conduct from a journalistic point of view. Not only that, but what you said to Ms. Boatright [a parent of a student who attended a WWASPS-affiliated school] may well constitute defamation and tortious interference."

---

[3] "TB" refers to "Tranquility Bay." Ivy Ridge and Tranquility Bay are schools affiliated with WWASPS.

-3-

> 3. "It is clear that your role as a journalist is being eclipsed by your very negative views of WWASPS schools. Contacting a parenting [sic] and ranting forth is well beyond the scope of your duty as a reporter."

*See id.* at ¶ 43.

The statement that Defendant Wall published directly to Mr. Beck is as follows:

> 4. "I definitely feel that the organization I represent [WWASPS] is being targeted and attacked in a vicious and subjective manner."

*See id.* at ¶ 41.

In addition to these e-mail statements, Plaintiff alleges that the following statements that appeared in a press release that Defendant Wall prepared on behalf of his client, WWASPS, after WWASPS filed a lawsuit against Plaintiff, were defamatory.

> 5. "Mr. Houlahan has gone beyond being a dedicated reporter. He has become what we can only term a destructive and biased force."
>
> 6. "[Mr.] Kay states that he knows of similar instances in which Mr. Houlahan has called parents and alleged falsities."

*See id.* at ¶ 47.

In the District of Columbia, a plaintiff who brings a defamation claim must demonstrate

> "'(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'"

*Beeton v. Dist. of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (quotation omitted).

Furthermore, when a public figure sues for defamation, he faces a heightened burden with respect to the fault element. Such a public figure cannot recover for defamation unless he can prove that

the defendant published the defamatory falsehoods with actual malice. *See Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003).

This Court has previously held that Plaintiff is a "public figure with respect to the debate on the teen behavior modification industry." *See* Dkt. No. 62 at 5 n.4. Therefore, to prevail on his defamation claim, Plaintiff must show, by clear and convincing evidence, that Defendant Wall made his statements with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). "The standard of actual malice is a daunting one." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996). To establish actual malice, a plaintiff must show that the defendant either knew that the challenged publication was false or that he "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Subjective ill-will does not establish actual malice, nor does a malevolent motive for publication." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)). "Even 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' does not establish actual malice." *Id.* (quoting [*Harte-Hanks*, 491 U.S.] at 666, 109 S. Ct. 2678). However, a plaintiff can show actual malice if he can establish that the defendant was "'subjectively aware that it was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [the defendant] had obvious reasons to doubt.'" *Id.* (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003)).

In addressing a defamation claim, the court's "threshold task . . . is to determine whether

the challenged statement is 'capable of bearing a particular meaning,' and 'whether that meaning is defamatory.'" *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (quotation omitted). "If the court determines that a statement is indeed capable of bearing a defamatory meaning, then whether that statement is in fact 'defamatory and false [is a question] of fact to be resolved by the jury.'" *Id.* at 594-95 (quotation and other citation omitted). "'In the District of Columbia, "a statement is defamatory if it tends to injure [the] plaintiff in his . . . trade, profession or community standing or lower him in the estimation of the community."'" *Beeton*, 779 A.2d at 923 (quotation omitted). However, "not every uncomplimentary publication is libelous." *Wilner*, 760 A.2d at 594. "'[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear "odious, infamous or ridiculous."'" *Id.* Nonetheless,

> [u]nder District of Columbia defamation law . . . a court's power to find that a statement is not defamatory as a matter of law is limited:
>
>> "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous."

*White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (quotation omitted).

In this case, of the six statements in dispute, four of them directly call into question Plaintiff's reputation as an investigative journalist. In Statement 2, Defendant Wall states that Plaintiff's conduct, in his view, is "wholly unethical conduct from a journalistic point of view. " In Statement 3, Defendant Wall states that it is clear that Plaintiff's "role as a journalist is being eclipsed by [his] very negative views on WWASPS schools. Contacting a parenting [sic] and

-6-

ranting forth is well beyond the scope of [Plaintiff's] duty as a reporter." Statement 5, which was contained in a press release that Defendant Wall prepared for his client WWASPS, states that Plaintiff "has gone beyond being a dedicated reporter. He has become what we can only term a destructive and biased force." Finally, in Statement 6, which also appeared in the press release, Defendant Wall quotes Mr. Kay as stating the he knew of similar instances in which Plaintiff had called parents and alleged falsities.

With respect to the remaining two statements, although they do not explicitly call Plaintiff's professionalism into question, a reasonable person could read these statements to imply that Plaintiff's conduct was unprofessional. In Statement 1, Defendant Wall refers to Plaintiff's "perverse views," such as torture, abuse and battery, and accuses him of sharing these views in telephone conversations with parents whose children attended WWASPS-affiliated schools. In Statement 4, Defendant Wall expresses his view that Plaintiff is targeting WWASPS and attacking WWASPS in a vicious and subjective manner.

In light of the fact that Plaintiff is an investigative journalist and that each of these six statements either explicitly or implicitly calls into question his professionalism as a journalist, the Court finds that these statements are capable of a defamatory meaning and could reasonably be understood in a defamatory sense. Therefore, the Court finds that Plaintiff has alleged facts sufficient to establish this element of his defamation claim for purposes of surviving summary judgment.

Having concluded that all of these statements are reasonably capable of a defamatory meaning, the Court must next determine whether an issue of fact exists as to the truth or falsity of these statements. Defendant Wall argues that these statements are true or, alternatively, that they

are statements of opinion and, thus, not readily capable of being proven true or false.

"Under *Milovich [v. Lorain Journal Co.*, 497 U.S. 1 (1990)], 'statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false.'" *Wilner*, 760 A.2d at 597 (quotation omitted). However, "'if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.'" *Id.* (quotation omitted). "'[A] statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore objectively verifiable.'" *Id.* (quotation omitted).

In Statement 1, Defendant Wall states, categorically, the fact that Plaintiff is "purveying [his] perverse views (torture, abuse, battery, etc.) in personal telephone conversations to parents who have a contractual relationships with Ivy Ridge/TB could well be an issue for their attorneys to take up." This statement implicitly, if not explicitly, relies on facts that are objectively verifiable. That is, either Plaintiff made personal telephone calls to these parents and provided them with his views that their children or others might have been subject to torture, abuse or battery or he did not. Therefore, the Court finds that this statement is actionable.

In Statement 2, Defendant Wall proclaims that, in his view, Plaintiff's conduct is unethical from a journalistic perspective and that what Plaintiff said to Ms. Boatright might constitute defamation and tortious interference. Again, a reasonable person reading this statement could believe that Defendant Wall based this statement on facts that he had in his possession, such as his knowledge of Plaintiff's conversation with Ms. Boatright. Therefore, the Court finds that this statement, even if an opinion, is actionable.

In Statement 3, Defendant Wall states that "[i]t is clear that [Plaintiff's] role as a journalist

-8-

is being eclipsed by [Plaintiff's] very negative views on WWASPS schools" and that Plaintiff's "[c]ontacting a parenting [sic] and ranting forth is well beyond the scope of [Plaintiff's] duty as a reporter."  In this statement, Defendant Wall explicitly provides at least one of the bases for his belief that Plaintiff's negative views about WWASPS schools have eclipsed his role as a journalist – Plaintiff's conversations with parents of children who attended those schools.  Therefore, the Court finds that this statement is actionable.

In Statement 4, Defendant Wall tells Mr. Beck, Plaintiff's editor, that he definitely feels that Plaintiff is targeting and attacking WWASPS in a vicious and subjective manner.  Again, this statement implies that Defendant Wall has facts in his possession on which he bases his "feeling" that Plaintiff was targeting and attacking WWASPS.  Therefore, the Court finds that this statement, even if opinion, is actionable.

Statement 5, which appeared in a press release that Defendant Wall prepared, states that Plaintiff "has gone beyond being a dedicated reporter.  He has become what we can only term a destructive and biased force."  Again, implicit in this statement, is that Defendant Wall has facts in his possession on which he bases this allegation.  Therefore, the Court finds that this statement is actionable.

Finally, Statement 6, which also appeared in the press release, states that Mr. Kay knows of similar instances in which Plaintiff called parents and alleged falsities.  This statement is clearly based on Defendant Wall's awareness that Mr. Kay has knowledge of wrongful acts.  Therefore, the Court finds that this statement is actionable.

Since the Court has found that all of these statements are actionable, the Court must now decide whether Plaintiff has raised an issue of fact about the falsity of these statements, all of

which Defendant Wall claims are true. This is an easy issue to resolve because the parties vehemently dispute, with competent evidence, the truth or falsity of every one of these statements. Given this competing evidence regarding the truth or falsity of these statements, this is not an issue that the Court can resolve as a matter of law. Therefore, the Court denies Defendant Wall's motion for summary judgment insofar as that motion is based on his contention that these statements are true.

Finally, the Court must determine whether Plaintiff has raised an issue of fact regarding whether Defendant Wall published these statements with actual malice.[4] When the defamation claim involves a public figure, the defendant's burden with regard to this element is to show "'that there is an absence of evidence to support the element of actual malice in the plaintiff's [defamation] case.'" *Parsi*, 890 F. Supp. 2d at 81 (quoting *Secord*, 747 F. Supp. at 787). In this regard, Defendant Wall asserts that he believed that what he was publishing was true. *See* Dkt. No. 160 at 23 (citing Exhibit F). Furthermore, he contends that he did not fabricate a story or

---

[4] Defendant Wall also argues that Plaintiff consented to the publication of the first four statements that appeared in e-mail messages. The statement on which Defendant Wall relies to support this argument is Plaintiff's statement, during a rather heated e-mail exchange with Defendant Wall, "Please do contact my editor on this issue" in response to Defendant Wall's e-mail regarding what he considered to be Plaintiff's unethical conduct and journalistic bias. When this statement is read in the context of the e-mail exchange surrounding this statement, no reasonable person could conclude that Plaintiff was giving his consent to the publication of these statements to his editor. Thus, the Court concludes, as a matter of law, that Plaintiff did not consent to Defendant Wall's publication of these e-mail statements.

Furthermore, the Court notes that, although Defendant Wall argues that he only provided these e-mails to Mr. Beck, Plaintiff's editor, who had a legitimate interest in them, Plaintiff states in his opposition papers, supported by record evidence, that Defendant Wall also sent these e-mails to Mr. Kay and directed Mr. Kay to send them to James Beasley, a Philadelphia attorney, and Mr. Kay did so. Although Defendant Wall filed a reply in response to Plaintiff's opposition papers, Defendant Wall did not address this issue.

base his statements on an unverified anonymous telephone call. *See id.* (citing Exhibit F). In addition, he states that there is no objective evidence that he did not publish the statements knowing that they were false or with reckless disregard for their truth. *See id.* To support this contention, Defendant Wall notes that Mr. Kay had forwarded him Ms. Boatright's statement regarding Plaintiff's contact with her. *See id.* (citing Exhibit F at ¶ 11). Mr. Kay also told Defendant Wall that Plaintiff had contacted parents other than Ms. Boatright and had conversations similar to the discussions he had had with her. *See id.* (citing Exhibit F at ¶ 13).

In addition, Defendant Wall asserts that he had conversations with Plaintiff regarding his contact with parents of other WWASPS students in which Defendant Wall had indicated to Plaintiff that his investigation had revealed information contrary to Plaintiff's interpretation of events. *See id.* at 23-24 (citing Exhibit A at 27-31 (November 24, 2003 – December 1, 2003 emails between Houlahan and Wall)). Defendant Wall also contends that the e-mails themselves show that he was truly concerned about balance and bias in the articles that Plaintiff planned to write about WWASPS. *See id.* at 24 (citing Exhibit A at 43 (September 11, 2003 email from Wall to Houlahan ("I am rather worried about your emotional attachment to this story, in fact," and "As for my reputation, I would be shirking my duty if I jumped ship because a reporter attacking my client gets threatening."))). Defendant Wall also wrote to Plaintiff, "You have created a perception in your mind that Ivy Ridge, TB and others [WWASPS-affiliated schools] are evil institutions based on incidents that are clearly and objectively benign as far as the schools are concerned." *See id.* at 25 (citing Exhibit A at 24-25 (January 29, 2004 email from Wall to Houlahan)). Defendant Wall claims that these e-mails reflect his efforts to obtain balance in the proposed articles and to inform Plaintiff about the positive aspects of the WWASPS program.

*See id.*

Moreover, Defendant Wall asserts that he had a very good reason to be concerned about Plaintiff's balance and bias. *See id.* In support of this contention, Defendant Wall cites Mr. Beck's deposition testimony that Plaintiff's own words compromised his own integrity by indulging his temper with Defendant Wall. *See id.* (citing Exhibit G at 66:4-66:17). Defendant Wall contends that, because of his very real concerns about Plaintiff's bias, he forwarded Plaintiff's e-mails to Mr. Beck and issued a press release. *See id.* at 26 (citing Exhibit F at ¶¶ 14, 16). After the press release, when Mr. Beck assured Defendant Wall that the stories would be "fair, balanced with comment from all sides, and accurate," Defendant Wall responded with gratitude. *See id.* (citing Exhibit A at 2 (February 16, 2004 - February 17, 2004 emails between Wall and Beck)). Furthermore, Defendant Wall asserts that the clear object of the press release was the defamation lawsuit that WWASPS had filed against Plaintiff. *See id.* (citing Exhibit H). Defendant Wall contends that the fact that the lawsuit was filed is additional objective evidence that he believed the contents of the press release were true. *See id.* Thus, Defendant Wall concludes that he had a reasonable basis for his belief in the veracity of his comments. *See id.*

To the contrary, Plaintiff notes that this Court has already ruled that "'Defendants cannot "automatically insure a favorable verdict by testifying that [they] published with a belief that the statements were true."'" *See* Dkt. No. 167 at 12 (quoting WWASPS Order, 11-12). Plaintiff contends that Defendant Wall's feigned outrage was his strategy and that every reporter who did a legitimate story on the Program was met with Defendant Wall's howls of protest about how unfairly his client WWASPS was being treated in an attempt to get their accurate but negative findings watered down. *See id.* (citing Exhibit 10). Plaintiff draws the Court's attention to an e-

-12-

mail from Mr. Kay stating that Defendant Wall had told him both that Plaintiff was WWASPS' main worry and that Plaintiff was nuts. *See id.* at 12-13. That e-mail is dated September 9, 2003, before Plaintiff had ever directed a cross word at Defendant Wall. *See id.* at 13 (citing Exhibit 20, E-Mail From Kay to Lichfield, 9 September 2003).

Plaintiff also contends that there is evidence that Defendant Wall was aware of the problems Plaintiff was finding. *See id.* For example, there is the recommendation that Defendant Wall sent to Mr. Kay, *see id.* (citing Exhibit 11), an e-mail that he sent to Plaintiff in which he admitted there had been abuse in Program facilities, *see id.* (citing Exhibit 9, ¶ 8), and an e-mail in which he recognized the possibility that Tranquility Bay might have something to hide, *see id.* (citing Exhibit 21, E-Mail From Wall to Kay, 7 October 2003). Plaintiff also points to e-mails in which Defendant Wall characterizes the owner of two facilities (and the brother of the Program's founder) as someone who should never run a facility. *See id.* (citing Exhibit 22, E-Mails From Wall to Houlahan, 15 and 26 September 2003). There is also an e-mail exchange between Defendant Wall and a journalist friend at *Fortune* in which Defendant Wall indicates that he hid evidence at Spring Creek Lodge. *See id.* He refers to it sarcastically as "the Eton of Montana." *See id.* In this exchange, his friend indicates that there had been earlier discussions of violence against children there. *See id.* (citing Exhibit 23, E-Mails Between Wall and Josh Hyatt, 29 November 2003).

Plaintiff also states that any reasonable person would have known that there were problems with the Program not just because of the findings of government agencies and highly regarded reporters, but because of the lack of graduates who were willing to speak in favor of the Program. *See id.* Plaintiff asserts that Defendant Wall cannot claim that he did not know this

-13-

because Plaintiff had told him that he was troubled by his inability to find such graduates. *See id.* (citing Exhibit 1, ¶¶ 156-159). Furthermore, Plaintiff notes that this Court has already found that the apparent falsity of the statements in question "'would allow a reasonable factfinder to conclude that Defendants acted with "wanton and reckless indifference" in publishing the challenged statements about [Plaintiff].'" *See id.* at 16 (quoting WWASPS Order, 14, citing *Curtis Publ'g*, 388 U.S. at 156).

Plaintiff also directs the Court's attention to the fact that a father had contacted him about his daughter, who while staying with him in South Carolina had been abducted and taken to a WWASPS-affiliated facility in upstate New York on the orders of her mother, his ex-wife. *See id.* at 17 (citing Exhibit 1, ¶ 196). The father told Plaintiff that they were denying him any contact with his daughter. *See id.* (citing [Exhibit 1], ¶ 200). Plaintiff informed Mr. Monterastelli, who worked with Defendant Wall, by phone that Ivy Ridge might be acting in violation of a Court Order and explained why. *See id.* (citing [Exhibit 1], ¶ 201). E-mails on this issue followed. *See id.* (citing Exhibit 26, E-mails Re: Dispute Over Child Taken From Father by Transporters). Citing what Jason Finlinson, the facility's director, who had only spoken to the mother, told them, Mr. Monterastelli and Defendant Wall dismissed the concerns Plaintiff expressed and his suggestion that their clients get to the bottom of it immediately. *See id.* (citing [Exhibit 26] at 1-3). Finally, the father, armed with the Divorce Decree, went to Ivy Ridge, where a New York State trooper had to order the facility to surrender the child, who by then was displaying symptoms consistent with food poisoning. *See id.* (citing Exhibit 1, ¶ 203).

Plaintiff asserts that this example shows that, even before the incident involving Ms. Boatright's son, Defendant Wall was on notice that Mr. Finlinson had credibility issues. *See id.*

Defendant Wall was given further reason to regard Mr. Finlinson as unreliable when, on a conference call, he denied knowing that the father had wanted his daughter out of Ivy Ridge although Defendant Wall and Mr. Monterastelli had been communicating with him about that very issue for two weeks. *See id.* at 18 (footnote omitted). Plaintiff argues that these e-mails demonstrate that Mr. Finlinson was aware of the controversy no later than 17 November 2003. *See id.* (citing Exhibit 26, Page 2). Mr. Finlinson then denied that Ms. Boatright's son had been injured until Plaintiff confronted him with the fact that he had an eyewitness with no axe to grind against the Program. *See id.*

Plaintiff also states that, although he had brought his concerns about abuse/neglect/illegality to Defendant Wall that had checked out in every case, Defendant Wall chose not to share this information with Mr. Kay and instead continually told Mr. Kay that Plaintiff was insane and out to get WWASPS. *See id.* (citing Exhibit 20 ("[James Wall] . . . says he is nuts."); Exhibit 21 ("[Plaintiff] is a nutcase, pure and simple."); Exhibit 27 ("Given that nothing will satisfy [Plaintiff], I don't think it really matters what we say.")). Also, Plaintiff notes that, when Mr. Kay posited that Plaintiff might not be such a bad person and just might need to be educated, Defendant Wall responded with an e-mail asking Mr. Kay if he had read "'the latest wacko correspondence from [Plaintiff].'" *See id.* (quoting Exhibit 28, E-Mails Between Kay and Wall, 17 November 2003). Defendant Wall was referring to the e-mails outlining Plaintiff's concerns about the child who had been abducted in South Carolina, concerns that proved well-founded. *See id.*

Finally, Plaintiff contends that, had Defendant Wall given Mr. Kay an accurate account of the conversation with Mr. Finlinson, it would have put Mr. Kay on notice that Plaintiff's sources

were sound, his were not, and that WWASPS should proceed carefully. *See id.* at 20. Instead, Defendant Wall continued to manipulate Mr. Kay, indicating that Plaintiff had been wild during the interview but that he had done a great job in getting Plaintiff to back off. *See id.* (citing Exhibit 29, E-Mail From Wall to Kay, 15 December 2003). WWASPS proceeded on this false information and the lawsuit and press release containing the offending allegations followed as a matter of course. *See id.* Plaintiff argues that Defendant Wall cannot escape liability by claiming that he honestly believed Mr. Kay's false characterization when Defendant Wall was the one responsible for that characterization. *See id.*

Based on the record evidence to which Plaintiff directs the Court's attention to support his claim that Defendant Wall acted with reckless disregard for the truth of the statements he made about Plaintiff, the Court finds that Defendant Wall has not met his burden, at this stage of the litigation, to "'show[] . . . that there is an absence of evidence to support the element of actual malice in the plaintiff's [defamation] case.'" *Parsi*, 890 F. Supp. 2d at 81 (quoting *Secord*, 747 F. Supp. at 787). Whether or not Plaintiff will be able to meet his burden of proof at trial to demonstrate by clear and convincing evidence that Defendant Wall made his statements with actual malice is an issue that the jury will have to decide. However, given that Plaintiff has raised an issue of fact about this element of his defamation claim, the Court cannot decide this issue as a matter of law.[5]

---

[5] Defendant Wall also argues that, even if the Court denies his motion for summary judgment, the Court should dismiss Plaintiff's claim for punitive damages. The Court finds that it would be premature to consider the issue of punitive damages at this time. Defendant Wall may renew this argument, if appropriate, after all of the evidence has been presented.

## IV. CONCLUSION

Accordingly, after reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED** with respect to Plaintiff's intentional interference with prospective economic advantage claim and is **DENIED** in all other respects.[6]

**IT IS SO ORDERED.**

Dated: February 11, 2014
Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

---

[6] The Court reminds the parties of the following deadlines: (1) the parties must file their pretrial submissions, including any motions *in limine*, on or before **March 12, 2014**; (2) the parties must file their responses to any motions *in limine* on or before **March 19, 2014**; (3) Plaintiff and Defendants' counsel shall appear for a Final Pretrial Conference on **March 26, 2014**, at **2:00 p.m.**; and the trial of this action will commence on **March 31, 2014**.